UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| AFFIDAVIT IN SUPPORT OF A CRIMINAL ) <br> COMPLAINT AGAINST RICHARD HEATH ) <br> MARSH FOR VIOLATIONS OF ) <br> 18 U.S.C. §§ 922(a)(1)(A) AND 922(o) AS ) <br> WELL AS 26 U.S.C. §§ 5861(d) and (e) ) <br> ) <br> AND ) <br> ) <br> IN THE MATTER OF THE SEARCH ) <br> OF THE PROPERTY LOCATED AT ) <br> 989 Margaret Drive, Alcoa, TN 37701, ) <br> MORE FULLY DESCRIBED IN ) <br> ATTACHMENTS A and B ) | Case No. 3:23-mj-1092 <br><br> FILED UNDER SEAL |

## AFFIDAVIT IN SUPPPORT OF AN APPLICATION FOR A SEARCH WARRANT AND CRIMINAL COMPLAINT

I, Special Agent Thomas Waggoner, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), being duly sworn, states the following:

1. For the past seven years, I have served as a Special Agent with ATF, pursuant to 18 U.S.C. § 3051, and have worked in law enforcement since 2013. I am also a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP), and the ATF Special Agent Basic Training (SABT) Program. I have received specialized training with respect to firearms violations and have been involved in numerous investigations involving illegal trafficking of firearms. I have further investigated and participated in numerous investigations involving federal firearms violations, including distribution and manufacturing of illegal firearms.

2. Based on my training and experience, most people who possess firearms store them in their homes. Firearms are not perishable, quickly consumed, or readily destroyed and do not lend themselves as well to rapid disposition, but are instead of a continuing nature, have an enduring utility to their holders, and their possession is typically constant and ongoing, often remaining in one person's possession for a long length of time.

1

3. Also, persons who possess firearms usually possess other items related to firearms, such as gun cases, ammunition magazines, holsters, spare parts, cleaning equipment, literature relating to firearms, photographs of firearms and receipts for the purchase of these items.

4. This Affidavit establishes facts and evidence demonstrating that there is probable cause to believe that Richard Heath MARSH committed violations of federal firearms laws, including violations of Title 18, United States Code Sections 922(a)(1)(A) – Dealing/Manufacturing Firearms Without a Federal Firearms License; 922(o) – Possession of a Machine Gun; 26 U.S.C. § 5861(d) – Possession of an Unregistered NFA firearm; and 26 U.S.C. § 5861(e) – Transferring a Firearm in Violation of the NFA. There is also probable cause to believe that evidence, fruits, and instrumentalities of the commission of these offenses will be found at the target location listed below.

5. I am submitting this Affidavit in support of both a criminal complaint against MARSH as well as a search warrant authorizing the search of a residence, curtilages, outbuildings, appurtenances, and attached and detached garages, located to the property boundary at 989 Margaret Drive, Alcoa, Tennessee 37701 ("TARGET RESIDENCE"), which is described in Attachment A, for the items specified in Attachment B.

6. The information established in this Affidavit is based on my personal involvement in the investigation, discussions with and/or the involvement of other law enforcement officers, review of various records, reports, and other documentation.

7. This Affidavit is intended to show only that there is sufficient probable cause for the requested criminal complaint and search warrant. This Affidavit does not set forth all of my knowledge about this matter. Facts presented in this Affidavit are based on my knowledge, observations, and direct participation in this investigation, as well as through conversations with other agents and/or persons involved in the investigation.

## PROBABLE CAUSE

8. Around August 2, 2021, I met with ATF Task Force Officer (TFO) Todd Strickenberger regarding information that Richard Heath MARSH was buying numerous firearms and potentially reselling

2

them without a Federal Firearms License (FFL). TFO Strickenberger received information from individual(s) working at Harvey's Pistol and Pawn, an FFL dealer in Knoxville, Tennessee, that MARSH had purchased numerous firearms within the previous two months from multiple FFLs in East Tennessee.

9. On August 10, 2021, I conducted eTrace queries on MARSH. eTrace is a web-based application that traces the purchase or use history of firearms used in violent crimes. The system is key in generating investigative leads to help solve violent crimes across the country. These leads help law enforcement agencies quickly identify potential firearm traffickers and suspects in criminal investigations. Firearms tracing, through eTrace, provides for the systematic tracing of a recovered firearm from the original manufacturer or importer, through the subsequent distribution chain (wholesaler/retailer). eTrace is the primary investigatory tool of ATF's National Tracing Center (NTC). ATF is the sole federal agency authorized to trace firearms; however, ATF is only authorized to trace firearms for law enforcement agencies involved in bona fide criminal investigations. When firearms are found at crime scenes, it is critical for investigators to quickly find the origin of the weapons and any possible suspects. eTrace is used for comparing firearms data across multiple jurisdictions, helping agencies close cases faster.

10. The data in eTrace comes from local, state, federal, and international law enforcement agencies. Authorized users can search eTrace data fields such as agency name, gun serial number, type of crime, recovery date and names of people involved. Participating law enforcement agencies can also opt to share firearms trace data with all other eTrace users in their state. eTrace thus allows its users to detect patterns of violent crime across jurisdictions. The eTrace system allows law enforcement agencies to conduct comprehensive traces of recovered crime guns and establish potential leads in their investigations. The system also provides an information platform that allows agencies to develop long-term strategies on how to reduce firearms-related crime, firearms trafficking, and community violence.

11. An eTrace search conducted on August 10, 2021, showed 17 multiple sales reports pertaining to MARSH, totaling approximately 60 firearms from August 4, 2020, through July 27, 2021. At that time, there was one firearm recovery with a "time-to-crime" of 39 days. It should be noted that the 'time-to-crime' feature is where ATF can determine the timeline from when a firearm is purchased until

when it is recovered in a crime. The reported case involved a vehicle pursuit involving the Knox County Sheriff's Office on April 30, 2021. Officers were able to apprehend the vehicle and recover three firearms as well as illegal narcotics from the driver and a passenger. Of the three firearms, one was originally purchased by MARSH.

12. I also received a separate, independent referral from an employee at Slater's In House Guns, an FFL dealer in Louisville, Tennessee. The employee stated that MARSH had purchased numerous firearms from them and openly discussed reselling firearms after originally purchasing them. The employee also stated that MARSH was using social media to sell firearms without a license. I then found a Facebook account attributable to MARSH where he was advertising and selling firearms on Facebook Marketplace.

13. On August 16, 2021, an ATF Special Agent, acting in an undercover capacity, (hereafter referred to as "ATF UC"), messaged Richard MARSH on Facebook Marketplace. MARSH had an advertisement with a photograph of several gun boxes from various manufacturers with the caption that read, "New Empty Container $15." The UC asked MARSH, "What can I fit in the Kel-Tec box if you got it?" MARSH responded, "No buddy I'm sorry, this is all I have right now." MARSH then sent a list of seven firearms that he had for sale.

14. The next day, on August 17, 2021, the ATF UC messaged MARSH about an interest in a Jacob Grey custom AR pistol, which was on the list that MARSH provided the ATF UC. The listing for the JG custom AR pistol stated as follows:

> AR15JG Jacob Grey Prec 5.56 Pistol JG Lower, Sparks Bros. Upper & Sparks Bros. M-Lok Handguard, CMC Lower parts Kit, Schmid Tool 2 stage Trigger, Ext. Bolt Release, Aero 7.5" Barrell, VG6 Precision Epilson 5.56/223 High Perf. Recoil Reproduction Muzzle Brake, Magpul handstop, Grip feels Amazing, Sig Sauer red dot Red Laser side Mount, meeting RedDot location sight on very accurate, Flip up Front & Rear. Sights Already Sighted in, SBPDW Brace W/ very smooth shooter, would like to This is a High quality AR pistol. I am not interested in trading $1350[.]"

15. The ATF UC told MARSH that they would have to acquire the funds to purchase the Jacob Grey AR Pistol on a later date.

16. Also, on this date, August 17, 2021, I conducted surveillance at the TARGET RESIDENCE to confirm MARSH's possible vehicles. A white Subaru Forrester with Tennessee license number CFJ356

4

was located at the TARGET RESIDENCE. I ran a computer check, and it showed that the vehicle was registered to MARSH.

17. On August 23, 2021, MARSH sent the ATF UC a new list of nine firearms for sale via Facebook Messenger. The ATF UC messaged MARSH and stated, "I'll have the money and be around Thursday if you still got that JG AR". MARSH responded with a "thumbs-up emoji" and sent the ATF UC seven photographs of the firearm. ATF UC and MARSH agreed to meet on August 26, 2021, at 2:00 PM.

18. On August 26, 2021, the ATF UC messaged MARSH to confirm if the firearm transaction was to take place. MARSH confirmed and told the ATF UC to meet him at the Wal-Mart in Alcoa, Tennessee. At 1:42 PM, the ATF UC drove to a nearby parking lot to the Wal-Mart in Alcoa, Tennessee to wait on MARSH. The ATF UC messaged MARSH that they were there; MARSH stated that he was running late and would arrive soon.

19. At 2:19 PM, MARSH messaged the ATF UC and stated he (MARSH) would arrive 5-7 minutes late and would be driving a grey Toyota Avalon. MARSH then messaged the ATF UC and stated that he (MARSH) wanted to meet at the Murphy's gas station, located across the street from the Wal-Mart. MARSH provided the ATF UC with his (MARSH's) phone number, (865) 296-1370.

20. The ATF UC called (865) 296-1370 and spoke with MARSH. MARSH stated that he (MARSH) wanted to meet on the backside of the Murphy's gas station to limit the number of people that might observe the firearm exchange. The ATF UC agreed to meet MARSH behind the Murphy's gas station. MARSH then told the ATF UC that he (MARSH) would be standing to the side of the building wearing a red shirt.

21. At 2:30 PM, the ATF UC drove into the parking lot of the Murphy's gas station and saw MARSH standing at the side of the building. The ATF UC recognized MARSH from photographs of MARSH that the ATF UC previously saw on Facebook. The ATF UC parked beside MARSH's vehicle and got out. MARSH introduced himself as "Richard." MARSH then opened the passenger's side front door of his vehicle, the Toyota Avalon. The ATF UC saw three gun bags laying in the passenger's seat. MARSH showed the ATF UC three firearms that were in his vehicle, which did not include the firearm the

5

ATF UC was purchasing. MARSH, for example, showed the ATF UC one Aero Precision AR-style pistol, one .308 Savage rifle, and one 9mm Aero Precision AR-type pistol. It should be noted that the other three firearms that MARSH showed the ATF UC were all listed for sale on the original message sent by MARSH. MARSH then handed the ATF UC the Jacob Grey, AR-type pistol—the firearm that the ATF UC had agreed to purchase.

22. The ATF UC asked MARSH if MARSH could build any custom firearm that the ATF UC or a friend might want in the future. MARSH agreed that he could build any type of requested firearm. MARSH then, referring to the Jacob Grey, AR-type pistol, stated, "I guess payment would be good, I think I have that other one sold too." ATF UC responded, "$1350.00?" MARSH disagreed and said the firearm's price was $1500.00. MARSH stated, "When I priced it at fifteen, I actually priced it too low, it's supposed to say sixteen." After further discussion, the ATF UC told MARSH to remove the optic from the firearm and sell then sell the firearm for $1,350.00; MARSH agreed. MARSH then stated that he (MARSH) needed a wrench to take the optic from the firearm. MARSH noted that he lived less than a half a mile away and told the ATF UC to follow him to his (MARSH's) house; the ATF UC agreed.

23. The ATF UC then followed MARSH back to MARSH's residence at 989 Margaret Drive, Alcoa, TN 37701, the TARGET RESIDENCE—they arrived around 2:46 PM. The ATF UC and MARSH parked their vehicles at the TARGET RESIDENCE, and MARSH went inside the TARGET RESIDENCE's open garage. The ATF UC remained in the driveway but could see and speak with MARSH while he was in the garage. MARSH asked the ATF UC if the ATF UC needed any ammo; the ATF UC declined. MARSH apologized for having to remove the optic from the firearm. MARSH then stated that it gets very confusing when he lists three AR's for sale at the same time. MARSH proceeded to show the ATF UC several firearms that were inside a safe in the TARGET RESIDENCE's garage. MARSH also retrieved some firearms from inside TARGET RESIDENCE that MARSH had for sale. MARSH then removed the optic from the Jacob Grey AR-type pistol and handed it to the ATF UC. In exchange, the ATF UC provided MARSH with $1,350.00 in U.S. currency from ATF Agent Cashier funds.

6

24. The ATF UC then asked MARSH if MARSH could get any type of gun the ATF UC wanted, including multiple firearms. MARSH replied, "Usually I can, ya, like right now I got like forty guns to pick up. I just don't have enough cash to get them all out." ATF UC responded, "where the hell you get forty guns, that awesome." MARSH replied, "Ya I'm not even a dealer either."

25. Marsh then showed the ATF UC several photographs of firearms from his (MARSH's) cellular phone, which included pistols and rifles that MARSH had for sale. MARSH described the firearms and how much he was selling them for to the ATF UC.

26. MARSH then went inside the TARGET RESIDENCE, retrieved a revolver, and returned to the garage. MARSH told the ATF UC that he (MARSH) was going to pick up two more "pieces" (meaning firearms) that day. Specifically, MARSH stated that he was going to pick up a Taurus .38 from a guy in town. MARSH then showed the ATF UC the retrieved revolver, which was a Chiappa Rhino, .357 caliber revolver. MARSH stated that he sold the revolver two months ago to a truck driver from Texas. MARSH said that the truck driver had already paid for the firearm and was coming later that day to pick it up. MARSH explained that the truck driver previously purchased several other firearms from him.

27. MARSH then told the ATF UC, "all my shits registered, except that's not," pointing to the firearm the ATF UC purchased. MARSH stated, "your lower is what gets registered, right, that's an unregistered open AR. It's never been registered to nobody." MARSH explained that he has a friend who owns a firearms warehouse, and that friend sells MARSH Jacob Grey, AR lower receivers from the warehouse without having to fill out the necessary paperwork. MARSH then said that he buys them from his friend and sells them. MARSH told the ATF UC that he (MARSH) was expecting to purchase a few more from his friend in the future.

28. At 3:07 PM, the ATF UC and MARSH agreed to stay in contact. The ATF UC then left the TARGET RESIDENCE with the purchased firearm. The purchased firearm was a Jacob Grey, model JG15, a 5.56-caliber pistol bearing serial number JG21206.

29. On October 1, 2021, the ATF UC attempted to contact MARSH via (865) 296-1370 to schedule a firearm transaction, but the attempt was unsuccessful.

7

30. On October 5, 2021, the ATF UC contacted MARSH about purchasing another firearm. MARSH sent another gun list via Facebook Messenger, and the ATF UC negotiated a price of $750.00 for a Glock 31 pistol. The transaction was to occur on October 6, 2021. On October 6, 2021, there was no exchange due to a lack of contact from MARSH, so the firearm purchase was canceled.

31. On January 10, 2022, I queried eTrace for updates on MARSH for multiple sales reports or crime-gun traces. I discovered that from the beginning of the investigation on August 10, 2021, MARSH's crime-gun traces increased from one to seven, and his multiple sales increased from 17 to 21.

32. Based on the increase in traces and multiple sales, I requested that the ATF UC reinitiate contact with MARSH for another firearm purchase. On January 10, 2022, the ATF UC attempted to contact MARSH via Facebook Messenger; MARSH responded. MARSH again provided a list of available firearms for sale.

33. In reviewing the list of firearms, I noticed that there was a Ruger 9mm pistol for sale. Based on my January 10, 2022, eTrace query, I knew that MARSH's latest multiple sale contained three pistols and one of them was a Ruger 9mm Pistol. The ATF UC requested to purchase the Ruger 9mm pistol; MARSH responded and priced the Ruger 9mm pistol at $550.00. MARSH and the ATF UC scheduled the exchange for January 12, 2022. The exchange, however, was cancelled due to lack of contact from MARSH.

34. Over the next several months, I continued to monitor eTrace for links to MARSH. eTrace showed several new traces to MARSH totaling 13. One purchase was a firearm that was later used in an assault and an attempted homicide in New Jersey, which was being jointly investigated by ATF and local agencies. Another purchased firearm attributable to MARSH was used in a "Felon in Possession" case in Charlotte, North Carolina. The subject firearm was a Glock pistol that had been altered to fire in a "full-auto" mode and was charged by ATF. In addition, other firearms attributable to MARSH were used in Tennessee crimes and various other states.

35. On August 12, 2022, the ATF UC sent MARSH a text message at (865) 296-1370. Specifically, the ATF UC texted, "Hey. Was looking to grab another AR or a glock or something next week." After a few text exchanges between the ATF UC and MARSH, MARSH sent the ATF UC several

8

photos of firearms that he (MARSH) had for sale. The ATF UC asked MARSH, in reference to one of the firearms MARSH sent a picture of, "What caliber is that AR pistol?" MARSH responded, "That is an Aero EPC9, 9mm, it also has a burst trigger, 3-6 rounds per pull of the trigger." The ATF UC told MARSH that they (the ATF UC) were interested in it. MARSH stated that the firearm was $1,550.00. The ATF UC responded, "Cool. If that's 3-6 rounds worth it. I'll be around Thursday or Friday next week." Marsh responded, "It's a cool shorting piece, the trigger is also a drop-in, I had it in my colt, but could not hold it down, the 9mm is pretty easy to control." The ATF UC and MARSH agreed to meet the following week.

36. On August 17, 2022, the ATF UC messaged MARSH at (865) 296-1370 and confirmed their meeting the following day at approximately 12:00 PM; MARSH agreed.

37. On August 18, 2022, the ATF UC messaged MARSH and asked if MARSH was ready to meet; MARSH responded that he needed 30 minutes and then would be ready. At 12:30 PM, the ATF UC pulled into the driveway of the TARGET RESIDENCE. At 12:50PM, MARSH appeared from behind the TARGET RESIDENCE and walked up to the ATF UC's vehicle. MARSH had an AR-type pistol slung around his neck. The ATF UC noticed that the pistol around MARSH's neck was the same pistol the ATF UC and MARSH had discussed in prior text messages. MARSH began telling the ATF UC about the pistol, stating: "One thing you really need to be careful about is this trigger." The ATF UC responded, "So it will rock and roll? It will shoot three to six rounds a pull?" Marsh responded, "Ya, every once and a while its just gonna throw one but almost every time its gonna be three to six." MARSH continued to explain the firearm to the ATF UC, who later asked MARSH if MARSH had other firearms to sell; MARSH agreed that he did.

38. The ATF UC asked MARSH if he could get any kind of firearm that the ATF UC might want. The ATF UC expounded, telling MARSH that the UC has a lot of people wanting guns. MARSH agreed and stated that he could get the ATF UC whatever he wanted. The ATF UC told MARSH of a "friend" looking for a gun, but the "friend" has a criminal conviction charge from the 80's and cannot buy a firearm. MARSH asked the ATF UC what kind of firearm the friend was wanting and what kind of guy the friend was. A woman, believed to be MARSH's mother, who lives at the TARGET RESIDENCE, came

9

out to the driveway where the UC and MARSH were and interrupted them. Once the woman reentered the residence, MARSH began talking about the firearm subject to the purchase.

39. MARSH then stated, "If you bought this piece with that trigger, dude it cost you $3,000 for this gun." ATF UC stated, "Are you serious, why?" MARSH replied, "Hell ya, with that trigger. Shit, you know how much people pay for fully automatic weapons." The ATF UC stated, "Oh cause I guess you gotta get a tax stamp." MARSH then said, "An AR, well it's hard to get approved too." MARSH stated, "If you do a regular AR they are gonna be about twenty five to three thousand, just a regular AR that's fully automatic." The ATF UC responded, "Because its legit on paper and all that crap." MARSH replied, "No, even if your buying it on the black market. You gonna try and buy a fully automatic someone gonna sell you one, its gonna cost Twenty-Five Hundred to Three grand apiece."

40. The ATF UC and MARSH continued talking about the AR-type pistol. MARSH told the ATF UC that he (MARSH) would not be able to make this firearm fully automatic because the best it will shoot is three to eight rounds per trigger pull. MARSH stated that he had emptied a 33-round magazine with 4-5 trigger pulls.

41. Later in the conversation, while continuing to talk about the parts of the AR pistol, MARSH stated, "I buy shit all the time because I build these things." The ATF UC inquired, "You just buying them and selling them?" MARSH replied, "Ya, I build them and sell them, I keep some of them and make some for family members."

42. The ATF UC and MARSH left the AR pistol in the ATF UC's vehicle and walked to MARSH's vehicle, the white Subaru Forrester, which was parked in the driveway of the TARGET RESIDENCE, while they talked about different firearms for the ATF UC to purchase. MARSH retrieved a 9mm pistol along with a .22 caliber pistol out of his vehicle and showed them to the ATF UC. MARSH told the ATF UC that those firearms were also for sale. MARSH then went into the TARGET RESIDENCE and retrieved two more firearms while the ATF UC waited outside in the driveway.

43. The ATF UC told MARSH that they (the ATF UC) wanted to buy the .22 caliber pistol, the 9mm pistol, and the AR pistol. MARSH agreed to sell the ATF UC all three firearms for $2,550.00. The ATF UC provided MARSH with $2,550 of agent cashier funds.

44. MARSH said to the ATF UC, "I got this one guy who buys, dude don't bring me nothing but Hundreds, he's probably bought thirty guns from me. In three years, he's probably bought thirty guns." MARSH then stated that he has a guy who comes up from South Carolina and has purchased ten Glock's at a time from him. MARSH also stated that he (MARSH) sold a guy in Sevierville, $20,000.00 worth of firearms in four months.

45. The ATF UC then asked MARSH if MARSH can get Glock pistols in the future; MARSH agreed that he could. The ATF UC told MARSH that they had shot a Glock with a switch on it. MARSH stated, "Oh the switch with the automatic, oh ya they are bad, I can get one of them too, they are $1,500." MARSH stated that he gets them from the guy in South Carolina and has shot them with him. MARSH clarified that the pistol would be $750.00 and the switch would be $750.00 for a total of $1,500.00. MARSH then escorted the ATF UC to a shed located behind the TARGET RESIDENCE. Inside the shed, MARSH showed the ATF UC MARSH's ammunition collection. MARSH gave the ATF UC a box of 9mm pistol rounds. MARSH and the ATF UC agreed to stay in touch for future firearm purchases. The ATF UC summarily purchased the following firearms from MARSH at the TARGET RESIDENCE: One (1) Aero Precision, model EPC9, 9mm pistol, serial # SF-007883, this firearm was equipped with a drop-in trigger system that was later determined to be a machine gun by the ATF Firearms Technology Criminal Branch via physical examination; One (1) Kel-Tec, model PMR-30, .22 caliber pistol, serial # WX8709; One (1) FEG, model PKJ-9HP, 9mm pistol, serial # B06452.

46. On August 29, 2022, I traveled to Charlotte, North Carolina to attend a proffer of Desmon Moore, who was previously arrested on a separate ATF investigation and identified MARSH as his firearms supplier. I met with other ATF special agents from the ATF Charlotte Office, Moore, and Moore's attorney. I showed Moore a copy of MARSH's Tennessee Driver's License photo and a Facebook profile of MARSH;

11

Moore identified MARSH as the same individual he (Moore) purchased firearms from. After identifying MARSH, Moore stated the following facts:

> a. Moore met MARSH during June 2021 when Moore was in the market for firearms and searched the website known as "Armslist." Moore located a profile selling firearms using the MARSH's telephone number, (865) 296-1370. Moore contacted the number and spoke with MARSH about purchasing a firearm. MARSH invited Moore to the TARGET RESIDENCE to conduct the purchase. MOORE advised that he traveled to the TARGET RESIDENCE and met MARSH on the front porch. Moore stated that he did not go inside, and MARSH brought several firearms out from the TARGET RESIDENCE for Moore to consider. MARSH displayed a variety of handguns and several AR-style firearms that MARSH claimed to have built. Moore stated that he bought several handguns/pistols from MARSH. MOORE did not recall the makes, models, or quantity of firearms he purchased or the amount of money he spent.
>
> b. Moore stated that from meeting MARSH in June 2021 until Moore's arrest on April 28, 2022, he (MOORE) traveled to the TARGET RESIDENCE on five separate occasions and purchased a total of one hundred (100) firearms from MARSH.
>
> c. Moore advised that the number of firearms purchased remained consistent, and that he would purchase 20 firearms every time they met. Moore stated that he spent $8,000.00-$10,000.00 in US Currency for each transaction. Moore explained that MARSH accepted cash or Cash App as payment for the transactions. Moore stated that he told MARSH that he (Moore) would be reselling the firearms for profit. Moore and MARSH made an agreement that since MOORE was "buying guns wholesale" that MARSH set a "tax" on the firearms that ranged from $20.00-$50.00 per firearm purchased. MOORE stated that he purchased primarily Glock pistols and would purchase other handguns if Glocks unavailable. Moore requested primarily 9mm and .40 S&W calibers firearms. Moore stated that he never purchased any AR style firearms from MARSH. Moore further advised that MARSH ran the firearm sales like a business and was "all about making his money."

47. On August 29, 2022, the ATF UC contacted MARSH at (865) 296-1370 and stated, "Hey Man. I'm Back in town. Any luck on a glock or anything?" MARSH responded, "I am supposed to pic a couple up later this week, I got one with a grey ghost slide but I think I'll hold on to it for now. Give me a few days, I'll get back with you. Did you shoot the AR9?" MARSH and the ATF UC continued conversation via cellular telephone in reference to the previously purchased full-auto 9mm AR-type pistol.

48. On September 6, 2022, I conducted a query for any past or current applications or attempts made by MARSH to obtain a Federal Firearms License, results were negative. I also requested a check for any firearms MARSH owns, and the Aero Precision, model EPC9, 9mm pistol, serial # SF-007883, in the National Firearms Registration and Transfer Record, which shows the registration of weapons under the National Firearms Act. MARSH and the firearm in question responded negative.

49. On September 6, 2022, the ATF UC messaged MARSH at (865) 296-1370 and stated, "Any luck on those[?]"

50. On September 7, 2022, MARSH responded using his cellular telephone, (865) 296-1370, and stated, "I have two on their way, but I'm not sure how long before it gets here, everything is taking forever right now. I have a 9mm lower that has been ordered since the first week of August and it's still not at my FFL dealer."

51. On September 20, 2022, the ATF UC messaged MARSH at (865) 296-1370 and stated, "Got anything good[?]" MARSH responded stating, "I'm still waiting on the 3 I bought online to get to my FFL dealer, I got a G40 Gen4 (10mm), a 19X (FDE/Bronze Slide) and G29 Gen4. I ordered a 9mm AR lower a week before that from a different place, but it still is yet to get to FFL either. Maybe any day now, I'll let you know as soon as they're here."

52. On October 17, 2022, the ATF UC messaged MARSH at (865) 296-1370 and stated, "Got anything good?" MARSH responded with a shared location text message. Then MARSH stated the following:

> I will have a Glock G26 9mm, it's a compact, 12 or 13 rounds, it's a nice piece but I can't get it yet because my background check is on hold all because there was one in my name involved in a crime. It didn't kill anyone, Thank The Lord, it was in South Carolina that's the second one in SC. N. time I bought one for myself and it took two weeks to get. This ite guy it Ty m is at the FFL right now so and he's got two more I might end up getting two more, one is a 10 mm, so I'll let you know for sure. I do have a bad ass 300 blackout 8 ½ inch barrel Aero Precision Enhanced handguard and a side charging non-reciprocating new frontier billet Upper and Lower, super nice looks better than the Jacob Grey I might keep it, but Ill let you look at it. Then I have a Ruger Mini 14, with factory folding stock." The ATF UC responded, "Ok that sounds good. I think I might be interested in that 300 and ruger.

53. The next day, on October 18, 2022, the ATF UC messaged MARSH at (865) 296-1370 and stated, "if your around tomorrow I could swing by and check them out".

54. The following day, on October 19, 2022, MARSH responded to the ATF UC apologizing for missing the message and began discussing specifics on the .300 blackout accompanied by several pictures of multiple firearms. Based on my training and experience, I know that a .300 blackout is in reference to a specific caliber of ammunition usually associated with AR style rifles and/or pistols. The

13

ATF UC responded that they would be available at the first of the following week; MARSH confirmed that would work.

55. On October 24, 2022, the ATF UC messaged MARSH at (865) 296-1370 and stated, "When you around this week[?]"

56. On October 28, 2022, MARSH responded to the ATF UC's message from October 24, 2022 and apologized for missing the message. MARSH attempted to schedule to meet that weekend. The ATF UC declined, stating that they would make contact later.

57. On October 29, 2022, MARSH responded, "Cool, I will have some other stuff next weekend, so holler at me, at end of the week."

58. On January 3, 2023, the ATF UC messaged MARSH at (865) 296-1370 and stated, "Got anything cool new this year[?]" MARSH responded, "HaHa, how ironic, I was just thinking about you last night." The ATF UC responded, "That means you must have some cool stuff." MARSH responded, "I have a couple of new items." MARSH attempted to send pictures of his firearm inventory but the message failed, and MARSH stated that he would provide a list of his inventory.

59. On January 4, 2023, the ATF UC messaged MARSH at (865) 296-1370 and stated, "Any luck on that list[?]" MARSH responded a list of seven firearms along with pictures. MARSH had listed for sale a Ruger PT94 .40 caliber pistol and a New Frontier S9 AR-style pistol. The ATF UC inquired about both firearms. The ATF UC and MARSH agreed on the transaction for both the AR-style pistol and the Ruger pistol for $1600.00. The ATF UC and MARSH agreed to meet on January 9, 2023.

60. On January 9, 2023, the ATF UC messaged MARSH at (865) 296-1370 and stated, "You around today[?]" MARSH responded, "Yeah, what time you thinking[?]" Both agreed to meet at approximately 2:00 PM. The ATF UC stated that they would be there in approximately one hour. MARSH responded, in referring to the TARGET RESIDENCE, "Ok, that works, you know where right?" The ATF UC responded, "Ya[,]" which was in reference to the TARGET RESIDENCE.

61. At approximately 1:40 PM, the ATF UC pulled into the driveway of the TARGET RESIDENCE. At approximately 1:52 PM, MARSH came outside the TARGET RESIDENCE carrying a

14

camouflage gun bag. MARSH first showed ATF UC two shotguns that MARSH was selling. One shotgun was a Winchester 12-gauge pump-action shotgun and the other was a semi-automatic 12-gauge shotgun. MARSH then retrieved a .22 caliber pistol from the camouflage gun bag and showed the ATF UC. MARSH also removed a Ruger .40 caliber pistol and a the 9mm AR-style pistol, which he and the ATF UC had previously discussed via text message with MARSH using cellular phone number (865) 296-1370 .

62. While discussing the 9mm AR-style pistol, the ATF UC asked MARSH if MARSH built the firearm; MARSH responded, "Ya." MARSH then pulled a .300 blackout caliber short-barreled rifle (SBR) out of the same gun bag and told the ATF UC about it. MARSH stated that he had just finished building it. The firearm was a Sharps Brothers MFG firearm bearing serial number OJ-06568. MARSH then discussed the 9mm AR-style pistol and the .300 blackout. MARSH then retrieved from the camouflage gun bag a 34-round magazine for the 9mm AR-style pistol. MARSH stated, in referencing the magazine and pistol, "It comes with one of these, I guess you'll get it loaded because I don't have any unloaded." MARSH then talked about the difference in the pistol brace, which was on the 9mm pistol and the rifle stock on the .300 blackout SBR. MARSH said, "This is not a pistol device, this is a rifle device because it doesn't have a hole or its not flat." The ATF UC responded, "So that's a buttstock?" MARSH responds, "Ya, that supposed to be a rifle, but I don't give a shit, they will just have to get me[,]" which I believe referred to law enforcement.

63. MARSH then pulled out a nine-shot .22 caliber revolver and a .357 caliber revolver for the ATF UC to view. MARSH then went back into the TARGET RESIDENCE and returned carrying a Colt .556-caliber rifle and a Remington 742 Woodsmaster 30-06-caliber rifle. MARSH stated that the Colt was not for sale, but the Remington was. MARSH then said that he (MARSH) was picking up a Ruger rifle later that day, and it would be for sale too. MARSH stated that he would sell the Ruger rifle for $1,300. MARSH showed the ATF UC a picture on his (MARSH's) phone of the rifle; while doing so, the ATF UC noticed that MARSH had numerous photos of other firearms contained on his phone.

64. The ATF UC then told MARSH that they (the ATF UC) would buy the 9mm AR-style pistol and the .40-caliber pistol for the previously agreed-upon price of $1,600. The ATF UC asked MARSH

15

how much MARSH wanted for the .357-caliber revolver; MARSH responded that the revolver was $300. The ATF UC agreed to buy all three firearms for $1,900. The ATF UC then provided MARSH with $1,900 of Agent Cashier Funds for the three firearms. The ATF UC then began talking to MARSH about the .300 blackout-caliber SBR again. The ATF UC asked if it was for sale. MARSH stated that he would sell it for $2,000.

65. MARSH again entered the TARGET RESIDENCE and returned with a box of gun parts. MARSH exclaimed he should be able to get $1,300 or $1,400 for the AR-style 9mm pistol. MARSH then showed the ATF UC some gun parts that were for sale. MARSH said that he (MARSH) would have some Glocks and stuff for sale within the next three weeks. MARSH stated that the last two Glocks he had for sale, he sold to his brother. He stated that he might also have a couple of Sig Sauer firearms for sale.

66. MARSH then asked the ATF UC how many rounds the ATF UC was able to get out of the AR-type pistol that MARSH sold the ATF UC on August 18, 2022. The ATF UC told MARSH that they (the ATF UC) were able to shoot six rounds at one time. MARSH stated that he knew it would shoot a lot, but it was only setup for three.

67. Before the ATF UC left the TARGET RESIDENCE, MARSH told the ATF UC that he (MARSH) would sell the semi-automatic shotgun for $300 and the pump-action shotgun for $260. The ATF UC left the TARGET RESIDENCE at approximately 2:36 PM. The ATF UC summarily purchased the following from MARSH: a Ruger P94 .40-caliber pistol SN: 340-60055 with 2 magazines and 10 rounds of ammunition, a Rossi/Taurus 461 .357-caliber revolver SN: HS921501 with 6 rounds of ammunition, a New Frontier G-9MM 9mm-caliber AR-style pistol SN: G9-00441 with 2 Glock-style magazines and 34 rounds of ammunition.

68. Based on the ATF UC firearms purchase from January 9, 2023, I again queried for any past or current applications or attempts made by MARSH to obtain a Federal Firearms License, results were negative. I also again conducted a computer check for any firearms MARSH owns, specifically a .300 blackout caliber short-barreled rifle (SBR), in the National Firearms Registration and Transfer Record

16

(NFRTR), which shows the registration of weapons under the National Firearms Act. MARSH and the firearm in question responded negative.

69. MARSH has, summarily, conducted three firearms transactions with the ATF UC at the TARGET RESIDENCE. Before the ATF UC transactions, I conducted pre-operational surveillance of the TARGET RESIDENCE and observed MARSH's vehicle at the TARGET RESIDENCE. I confirmed that the vehicle at the TARGET RESIDENCE was registered to MARSH. I conducted surveillance, as recently as April 30, 2023, and confirmed that MARSH's registered vehicle, the white Subaru Forrester, was parked in the driveway of the TARGET RESIDENCE. On this date, the garage door was open and the standing gun safes that MARSH keeps firearms in were clearly visible and still located at the residence. Also, during surveillance as recent as January 19, 2023, I observed MARSH in the driveway of the TARGET RESIDENCE performing vehicle maintenance. The white Subaru was parked in the driveway. I located vehicle records for the Subaru Forrester with MARSH as the registered owner. The Tennessee Registration for that vehicle was updated on May 31, 2022, and set to expire May 31, 2023. On that record, MARSH has the TARGET RESIDENCE listed as his mailing address. Then I queried open-source credit reports and located TransUnion records that show that MARSH listed the TARGET RESIDENCE as his most recent address, reported on July 31, 2021. I located Equifax Records that showed that MARSH listed the TARGET RESIDENCE as his most recent address, reported in March 2021. And I also located Experian Records that showed that MARSH listed the TARGET RESIDENCE as his most recent address as of March 29, 2021.

## CONCLUSION

Based on the forgoing, there is probable cause to believe that MARSH committed violations of Title 18, United States Code Sections 922(a)(1)(A) – Dealing/Manufacturing Firearms Without a Federal Firearms License; 922(o) – Possession of a Machine Gun; 26 U.S.C. § 5861(d) – Possession of an Unregistered NFA firearm; and 26 U.S.C. § 5861(e) – Transferring a Firearm in Violation of the NFA. There is also probable cause to believe that evidence, fruits, and instrumentalities of these crimes will be

found at the TARGET RESIDENCE. Therefore, I respectfully request that the Court issue the proposed criminal complaint and search warrant.

Respectfully submitted,

_____
Thomas Waggoner
ATF Special Agent

Subscribed and sworn to before me on this 17th of May 2023.

_____
DEBRA C. POPLIN
UNITED STATES MAGISTRATE JUDGE